**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | **Case No. 3:22-cv-00003-ZNQ-TJB** |
| Plaintiff, | |
| v. | **CIVIL ACTION** |
| READE MANUFACTURING COMPANY d/b/a MAGNESIUM ELEKTRON POWDERS NJ, | |
| Defendant/Counterclaimant. | |

---

### ANSWER AND COUNTERCLAIM OF DEFENDANT READE MANUFACTURING COMPANY d/b/a MAGNESIUM ELEKTRON POWDERS NJ

---

Defendant Reade Manufacturing Company d/b/a Magnesium Elektron Powders NJ ("Reade"), by and through its undersigned counsel, Archer & Greiner, P.C., hereby files this Answer to the Complaint of Plaintiff Liberty Mutual Fire Insurance Company ("Liberty"), and in support thereof avers as follows:

### NATURE OF THE ACTION[1]

1.      Denied that Liberty's policy has a total pollution exclusion which precludes coverage for the claims against Reade.  The remaining allegations of this paragraph are argumentative and state a legal conclusion and, thus, no further response is required.

### PARTIES

2.      Reade is without knowledge or information sufficient to form a reasonable belief as to the allegations of this paragraph and leaves Liberty to its proofs.

---

[1] Reade adopts the headings utilized by Liberty for organizational purposes only.

3.     Admitted that Reade is a Delaware company with a principal place of business located at 2590 Ridgeway Blvd, Manchester Township, NJ 08759.  The remaining allegations of this paragraph are denied as stated.  Reade is a 100% owned subsidiary of MEL Chemicals, Inc., which is in turn a 100% owned subsidiary of BA Holdings, Inc.

## JURISDICTION AND VENUE

4.     The allegations of this paragraph state a legal conclusion and, thus no response is required.  Moreover, by Order dated December 28, 2021, the Hon. Dolly M. Gee, U.S.D.J. in the United States District Court for the Central District of California, transferred this action to this Court.  Thus, jurisdiction and venue are properly before this Court.

5.     The allegations of this paragraph state a legal conclusion and, thus no response is required.  Moreover, by Order dated December 28, 2021, the Hon. Dolly M. Gee, U.S.D.J. in the United States District Court for the Central District of California, transferred this action to this Court.  Thus, jurisdiction and venue are properly before this Court.

6.     The allegations of this paragraph state a legal conclusion and, thus no response is required.

## LIBERTY MUTUAL POLICY

7.     The Policy (as defined in the Complaint) speaks for itself and, thus, no further response is required.

8.     Admitted.

9.     The Policy speaks for itself and, thus, no further response is required.

10.    The Policy speaks for itself and, thus, no further response is required.

11.    The Policy speaks for itself and, thus, no further response is required.

## LAWSUITS

12.    The Lawsuits (as defined in the Complaint) speak for themselves and, thus, no further response is required.

13.    The Lawsuits speak for themselves and, thus, no further response is required.

14.    The Lawsuits speak for themselves and, thus, no further response is required.

15.    The Lawsuits speak for themselves and, thus, no further response is required.

16.    The Lawsuits speak for themselves and, thus, no further response is required.

17.    The Lawsuits speak for themselves and, thus, no further response is required.

18.    The Lawsuits speak for themselves and, thus, no further response is required.

19.    The Lawsuits speak for themselves and, thus, no further response is required.

20.    Reade is without knowledge or information sufficient to form a reasonable belief as to the allegations of this paragraph and leaves Liberty to its proofs.

21.    The US Ecology Lawsuit speaks for itself and, thus, no further response is required.

22.    The Lawsuits speak for themselves and, thus, no further response is required.

23.    The Lawsuits speak for themselves and, thus, no further response is required.

24.    The Vance Lawsuit and Green Lawsuit speak for themselves and, thus, no further response is required.

25.    The US Ecology Lawsuit speaks for itself and, thus, no further response is required.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment – No Duty to Indemnify)

26.     Reade realleges and incorporates its responses to the allegations of the foregoing paragraphs as if fully set forth herein.

27.     The Policy's Total Pollution Exclusion speaks for itself and, thus, no further response is required.

28.     The allegations of this paragraph state a legal conclusion and, thus, no further response is required.  To the extent the allegations suggest or imply that the Policy's Total Pollution Exclusion bars coverage for Reade with respect to the Lawsuits, or otherwise, they are expressly denied.

29.     The allegations of this paragraph state a legal conclusion and, thus, no further response is required.  To the extent the allegations suggest or imply that the Policy's Total Pollution Exclusion bars coverage for Reade with respect to the Lawsuits, or otherwise, they are expressly denied.

30.     The allegations of this paragraph state a legal conclusion and, thus, no further response is required.  To the extent the allegations suggest or imply that the Policy's Total Pollution Exclusion bars coverage for Reade with respect to the Lawsuits, or otherwise, they are expressly denied.

31.     Admitted that Liberty has denied coverage under the Policy.  However, Liberty's denial is improper and in bad faith.

32.     Admitted.

33.     The allegations of this paragraph state a legal conclusion and, thus, no further response is required.

34.     The allegations of this paragraph state a legal conclusion and, thus, no further response is required.  To the extent the allegations suggest or imply that the Policy's Total Pollution Exclusion bars coverage for Reade with respect to the Lawsuits, or otherwise, they are expressly denied.

**WHEREFORE**, Reade demands judgment against Liberty:

(a)     Dismissing Liberty's Complaint with Prejudice;

(b)     Declaring that:

    i.     Liberty is obligated to provide coverage to Reade under the Policy;

    ii.     Upon exhaustion of the "Self-insured amount", Liberty is obligated under the Policy to reimburse Reade for its "allocated loss adjustment expense" incurred in connection with the Lawsuits, up to the Policy limits; and

    iii.     upon exhaustion of the "Self-insured amount", Liberty is obligated under the Policy to indemnify Reade for any liability adjudged against it in the Lawsuits, up to the Policy limits;

(c)     For reimbursement by Liberty of Reade's attorneys' fees, expenses and costs incurred in defending this action; and

(d)     For such other and further relief as the Court may deem just and proper.

## AFFIRMATIVE DEFENSES

As separate and distinct defenses to Liberty's Complaint, Reade, without conceding that it bears the burden of proof as to any of them, and without in any way admitting any of the allegations of the Complaint, alleges as follows:

1.     Liberty's Complaint fails to state a claim upon which relief can be granted.

2.     Liberty's claims are barred by reason of the doctrine of estoppel.

3.     Liberty's claims are barred by reason of the doctrine of waiver.

4.     Liberty's claims are barred by reason of the doctrine of laches.

5.     Liberty's claims are barred by reason of the doctrine of unclean hands.

6.      Liberty has breached the terms of the Policy.

7.      Reade has complied with all obligations under the Policy.

8.      The Policy's Total Pollution Exclusion is inapplicable and does not preclude coverage for the claims of Reade asserted for coverage in the underlying Lawsuits.

9.      Liberty's interpretation of the relevant provisions of the Policy is contrary to the reasonable expectations of Reade, as the insured.

10.      Liberty's actions and inactions are unreasonable, contrary to the Policy, practice and standard and taken in bad faith.

## COUNTERCLAIM

### THE PARTIES

1.      Reade is a manufacturer of particulate magnesium powders and products.

2.      Upon information and belief, Liberty is a Wisconsin corporation with a principal place of business located at 175 Berkeley Street, Boston, MA 02116.

3.      Upon information and belief, Liberty, now and at all times relevant to the allegations in this Complaint, was (and is currently) licensed or authorized by various states, including the State of New Jersey, to sell insurance policies, including the policy at issue herein.

### JURISDICTION AND VENUE

4.      The jurisdiction of this Court is invoked pursuant to 23 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

5.      Jurisdiction is also conferred upon this Court as the issue in controversy concerns the rights of Reade under insurance policies issued by Liberty and, as such, the matter is subject to the Declaratory Judgment Act, 28 U.S.C. § 2201 (the "DJA").

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Reade resides and does business within this District.

## FACTUAL BACKGROUND

**The Liberty Mutual Policy**

7.      Liberty issued insurance policy no. TB2-691-469348-018 to BA Holdings, Inc. and Luxfer Holdings, with effective dates of August 1, 2018 to August 1, 2019.

8.      According to Liberty, but which assertion Reade does not concede, the foregoing policy was cancelled as of the date of inception and rewritten as policy no. EB2-691-469348-038, with effective dates of August 1, 2018 to August 1, 2019 (solely for purposes herein, the "Policy").  The Policy has a per occurrence and general aggregate limit of $2 million, excess of a "Self-insured amount" of $1 million.  A true copy of the Policy is attached hereto as **Exhibit A**.

9.      The Policy contains an endorsement titled "Broad Form Named Insured – Majority Interest", which provides in relevant part as follows:

> A.      The term Named Insured includes: the person or organization designated in the Declarations as the first Named Insured; the person(s) or organization(s) shown in the Declarations Extension Schedule (Named Insured); and any other organization (except for a partnership or joint venture) incorporated or organized under the laws of the United States of America or its states, territories or possessions; Puerto Rico; or Canada or its provinces, but only while the first Named Insured or any of the Named Insureds shown in the Declarations Extension Schedule (Named Insured) directly or indirectly owns, during the policy period, an interest therein of more than 50%....

10.      Reade is a 100% owned subsidiary of MEL Chemicals, Inc., which is in turn a 100% owned subsidiary of BA Holdings, Inc.  Thus, Reade is a Named Insured under the Policy.

11.      The Policy contains an Excess Commercial General Liability Coverage Form that sets forth, in relevant part, the following Insuring Agreement:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.      **Insuring Agreement**

      a.      We will pay those sums in excess of the "self-insured amount" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this excess insurance applies.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION VII – SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE. The amount we will pay for damages is limited as described in SECTION III – LIMITS OF INSURANCE….

***

      d.      Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

      e.      We WILL NOT have the duty to defend or investigate any claim or "suit" seeking damages to which this insurance may apply.

      f.      Rights and duties relating to the defense, settlement and investigation of claims or "suits" to which this insurance may apply are set forth in SECTION VI - DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND SUITS.

12.     Section V of the Policy sets forth the following relevant definitions:

      2.      "Allocated loss adjustment expense" [as amended by endorsement] includes but is not limited to:

          (a)      reasonable attorneys' fees for claims in suit (reasonable attorneys' fees means rates which are actually paid by us to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended);

          (b)      other costs and other items of expense such as:

              (i)      costs for medical, expert and other witnesses at trials or hearings, stenographic costs and

8

costs of copies of documents and transcripts; and

(ii) medical, expert or consultant fees and expenses relating to the defense of any claim or "suit".

(c) up to $250 for cost of bail bonds required because of accident or traffic law violations arising out of the use of any Vehicle to which the Bodily Injury Liability Coverage applies, but we do not have to furnish these bonds;

(d) the cost of appeal bonds and bonds to release attachments within the applicable limit of insurance, but we do not have to furnish these bonds;

(e) all costs taxed against the insured in the "suit";

(f) pre-judgment interest against the insured on that part of the judgment that is in excess of the "self-insured amount" but not in excess of the applicable limit of insurance, but if we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer; and

(g) interest on that part of the judgment that is in excess of the "self-insured amount" but not in excess of the applicable limit of insurance which accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is in excess of the "self-insured amount" but within the applicable limit of insurance.

***

4. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

***

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

9

\*\*\*

17. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*\*\*

19. "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

20. "Self-insured amount" means:

    a.    If the insured has no "other insurance" or has "other insurance" less than the amount shown in the Declarations under item 4:

        (1)    With respect to damages to which this policy (including any endorsements(s) thereto) applies on an each "occurrence" basis:

                As to each "occurrence", the amount shown in the Declarations under item 4, Self-insured Amount.

        (2)    With respect to damages to which this policy (including any endorsements(s) thereto) applies on each claim, each accident, each person or organization, each disease or other stated basis rather than on an each "occurrence" basis:

                As to each claim, each accident, each person or organization, each disease or other stated basis, whichever applies, the amount shown in the Declarations under item 4, Self-insured Amount.

13.     Section VII (Supplementary Payments/Allocated Loss Adjustment Expense), as amended by endorsement, provides, in relevant part, as follows:

> 1.     Where the insured controls the defense, we will reimburse the insured for "allocated loss adjustment expense" incurred by the insured for any "occurrence" after the "self-insured amount" has been exhausted by the payment of damages and/or "allocated loss adjustment expense" by the insured for that "occurrence". Our obligation to reimburse the insured is limited as set forth in the Section VI – Defense, Settlement and Investigation of Claims, Paragraphs (5) and (6).
>
> ***
>
> 4.     **Allocated Loss Adjustment Expense paid by the insured will reduce the "self-insured amount".**
>
> 5.     **Allocated Loss Adjustment Expense paid or reimbursed by us will reduce the limits of insurance.**

14.     The Policy also contains a Total Pollution Exclusion Endorsement, which provides as follows:

> Exclusion f. under Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury and Property Damage Liability is replaced by the following:
>
> This insurance does not apply to:
>
> **f.     Pollution**
>
> (1)     "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.
>
> (2)     Any loss, cost or expense arising out of any:
>
> (a)     Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)     Claim or suit by or on behalf of a
governmental authority for damages because
of testing for, monitoring, cleaning up,
removing, containing, treating, detoxifying
or neutralizing, or in any way responding to,
or assessing the effects of, "pollutants".

**The US Ecology Lawsuit**

15.     On or about November 16, 2020, US Ecology Idaho, Inc. and US Ecology, Inc.

(collectively, "US Ecology") filed a Complaint against Capitol Environmental Services, Inc.

("Capitol") and Reade in the District Court for the Fourth Judicial District of the State of Idaho,

In and For the County of Ada, Case No. CV01-20-18626 (the "US Ecology Complaint"), arising

out of an explosion (the "Explosion") at US Ecology's facility in Grand View, Idaho, USA (the

"Facility").  The Explosion allegedly resulted in extensive property damage to the Facility.  A

true copy of the US Ecology Complaint is attached hereto as **Exhibit B**.

16.     As set forth in Reade's answer to the US Ecology Complaint, as same may be

amended from time to time ("Reade Answer"), Reade disputes the vast majority of factual

allegations of the US Ecology Complaint and nothing herein shall be deemed an admission of

any such allegations.

17.     In the US Ecology Complaint, US Ecology alleges that it operates a waste

treatment, storage, and disposal facility and, thus, has experience and expertise in handling such

waste.

18.     US Ecology alleges that on November 12, 2018, Capitol, as Reade's alleged

commercial waste "broker", delivered 193 drums of waste originating from Reade's

manufacturing facility to US Ecology for "deactivation."  Capitol allegedly represented and

certified that the subject waste consisted of 133 drums of ultra-fine magnesium powder

("UFMP"), 33 drums of magnesium sweeps, and 27 drums of burnt magnesium (collectively, the "Waste").

19.    US Ecology claims that, on November 13, 2018, its laboratory screened "samples" from selected Reade drums in accordance with the "site waste analysis plan", but the results of that screening, and the requirements of the "site waste analysis plan," have not been fully disclosed to Reade.

20.    US Ecology alleges that, on November 17, 2018, it organized "four batches" of Reade's UFMP for processing. After organizing the "UFMP drums", US Ecology claims that it added water to "Pit 1" in preparation for "the deactivation phase of the treatment" before adding the contents of 43 drums, comprising the "first batch" of UFMP.

21.    US Ecology claims that, after the drums were emptied into Pit 1, its operators observed that the reaction looked normal.

22.    Monty Alex Green, a US Ecology operator, then allegedly climbed into Pit 1 to prepare the mixing phase of the treatment process.  US Ecology generically claims that "shortly thereafter" the Explosion occurred.

23.    US Ecology quite generally alleges that the Waste being treated at the time of the Explosion was "nonconforming" because, according to US Ecology, it contained constituents other than UFMP.  However, the specific contents of the 43 drums, which were allegedly being treated at the Facility at the time of the Explosion, have not been disclosed by US Ecology to Reade.

24.    Based upon these allegations, all of which remain unsubstantiated and subject to competent proof which has yet to be provided by US Ecology to Reade, the US Ecology Complaint asserts, *inter alia*, that Reade was negligent.

25.     US Ecology further alleges that, as a direct and proximate result of Reade's negligence, US Ecology has, through the Explosion, suffered damage to real and personal property, business interruption, loss of profits and other loss and damage.

26.     Other than pictures of the Facility following the Explosion, US Ecology has yet to produce proof of any such claimed damages to Reade.

27.     Reade denies the allegations asserted against it in the US Ecology Complaint.

28.     The US Ecology lawsuit is presently in the early stages of discovery and no determinations or rulings have been made regarding the cause of the Explosion, any liability of Reade for the Explosion, or any damages claimed by US Ecology.

29.     In fact, to date, despite requests and formal demands in the subject litigation, US Ecology has produced no proof of negligence or other culpability on the part of Reade.

**The Green Lawsuit**

30.     On or about November 13, 2020, Austin Green and Monty Green, as heirs of Monty Alex Green (and as representatives of his Estate), filed suit against Reade and Capitol in the District Court for the Fourth Judicial District of the State of Idaho, In and For the County of Ada, Case No. CV01-20-18565, in connection with Mr. Green's death as a result of the Explosion ("Green Complaint").  A true copy of the Green Complaint is attached hereto as **Exhibit C**.

31.     The Green Complaint asserts many of the same claims as the US Ecology Complaint against Reade, including negligence.

32.     At its core, the Green Complaint alleges that Reade was negligent and acted in breach of its duty of care by reason of its conduct before and at the time of Mr. Green's death

and that such claimed negligence was the proximate cause in bringing about the Explosion and Mr. Green's death.

33.     Reade denies the allegations asserted against it in the Green Complaint.

34.     The Green lawsuit is presently in the early stages of discovery and no proof of such allegations by Green against Reade has been produced to Reade.

35.     No determinations or rulings have been made regarding the cause of the Explosion or any liability of Reade for the Explosion or Mr. Green's death.

**The Vance Lawsuit**

36.     On or about November 16, 2020, Robert Vance, a US Ecology employee, filed suit against Reade and Capitol in the District Court for the Fourth Judicial District of the State of Idaho, In and For the County of Ada, Case No. CV01-20-18654, alleging that he was injured by the Explosion ("Vance Complaint").  A true copy of the Vance Complaint is attached hereto as **Exhibit D**.

37.     The Vance Complaint asserts nearly identical claims as those asserted in the Green Complaint against Reade, including for negligence.

38.     Reade denies the allegations asserted against it in the Vance Complaint.

39.     The Vance lawsuit is presently in the early stages of discovery and no determinations or rulings have been made regarding the cause of the Explosion or any liability of Reade for Mr. Vance's alleged injuries.

40.     There has been no determination by the Court, let alone proof submitted by any of the Plaintiffs, that the Explosion was caused by the Waste or any action on the part of Reade.

**Liberty Provides Pre-Lawsuit Coverage for Reade**

41.     Shortly after the Explosion, in late 2018, Reade and its insurance broker provided Liberty with notice of Reade's insurance claims (related to the Explosion) under the Policy (the "Claims").

42.     Reade and its counsel had subsequent communications regarding the Claims in late May and early June, 2019, with Liberty's Senior Claims Specialist, Christine Colby and corporate counsel, Courtney Gribbon.

43.     In August of 2019, Liberty (through Ms. Gribbon) agreed to cover Reade's legal costs and expenses (as negotiated between Reade's counsel and Liberty's counsel) under the Policy.

44.     In fact, subsequent to that time, Liberty did pay legal costs and expenses of Reade under the Policy.

45.     Liberty did not reserve any rights under the Policy in paying such legal fees, costs and expenses of Reade in connection with the Claims.

**Liberty Reverses Course and Denies Coverage for Reade**

46.     In September of 2020, counsel for Green presented a settlement demand to Reade.

47.     Reade promptly gave Liberty notice of such demand (to Ms. Colby and Ms. Gribbon).

48.     Liberty claimed to be "investigating" the Claims and information provided by Reade and its counsel, but, on October 19, 2020, Liberty sent Reade's General Counsel a reservation of rights letter, in which Liberty essentially advises Reade that it declines to defend Reade against the Claims under the Policy and that Reade will be responsible for its own legal defense and costs.

49.     In November of 2020, upon being served with the US Ecology Complaint, the Green Complaint, and the Vance Complaint (collectively, the "Underlying Lawsuits"), Reade promptly tendered them to Liberty and demanded coverage under the Policy.

50.     By letter dated January 25, 2021, despite there being no discovery taken or finding made in the Underlying Lawsuits, Liberty denied coverage for Reade with respect to the Underlying Lawsuits, claiming that coverage is barred by the Policy's Total Pollution Exclusion Endorsement.

51.     More specifically, Liberty took the position that:

> The Lawsuits allege that US Ecology was handling hazardous waste from Reade.  US Ecology released the hazardous waste into a pit which caused the explosion.  Hazardous waste is a "pollutant" under the Excess Policy's definition of pollutants.  The explosion happened due to a release of the pollutants.  The "bodily injury" and "property damage" alleged in the Lawsuits would not have occurred but for the discharge and release of hazardous waste.

52.     By letter dated May 7, 2021, Reade, through its counsel, demanded that Liberty reconsider its coverage position because, *inter alia*, Liberty's assertion of the Total Pollution Exclusion is premature and, in any event, is inapplicable.

53.     By letter dated June 4, 2021, Liberty, through its counsel, maintained its coverage denial based on the Policy's Total Pollution Exclusion.

54.     Liberty's outright denial of coverage is, in the first instance, premature, as there have been no rulings or determinations in the Underlying Lawsuits regarding the cause of the Explosion.

55.     Liberty's conclusion regarding the supposed causation of the Explosion is simply self-serving and is a bad-faith, blatant violation of its obligations under the Policy.

56.     Liberty's attempt to apply the Total Pollution Exclusion to acts of ordinary negligence involving any alleged substance defeats the commercial purpose for which the parties

contracted for insurance – to cover "bodily injury" or "property damage" arising out of the conduct of Reade's business operations.

57.     Liberty's coverage position is contrary to controlling law, which has clearly limited application of the Total Pollution Exclusion to injuries arising from traditional environmental pollution events – consistent with the exclusion's historical objective to avoid liability for environmental catastrophe related to intentional industrial pollution.

58.     The foregoing limited and controlling application of the Total Pollution Exclusion is also consistent with the purpose of commercial general liability policies – *i.e.,* to provide the insured with the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage arising out of the conduct of the insured's business.

59.     The Underlying Lawsuits do not seek to recover damages arising out of traditional environmental pollution or intentional industrial pollution.

60.     The Underlying Lawsuits do not allege environmental damage or seek to recover the costs of remediating environmental pollution.

61.     The Underlying Lawsuits do not allege a "discharge, dispersal, seepage, migration, release or escape of 'pollutants'" as those terms are used in the context of environmental law.

62.     To the contrary, Plaintiffs in the Underlying Lawsuits seek only damages for alleged "bodily injury" and "property damage" related to an unexpected and accidental event (*i.e*., the Explosion), the cause of which has yet to be substantiated.

## FIRST COUNT

### (Declaratory Judgment)

63.     Reade repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     As a result of the facts, conditions and circumstances set forth above in this Complaint, there exists an actual and justiciable controversy between Reade and Liberty.

65.     Pursuant to the DJA, Reade is entitled to a declaration of its rights under the Policy.

66.     Liberty's coverage obligations are determined by the allegations contained in the Underlying Lawsuits and are triggered whenever the allegations state a cause of action that gives rise to the reasonable possibility of coverage under the Policy.

67.     To date, there have been no rulings or determinations in the Underlying Lawsuits regarding the cause of the Explosion.

68.     However, the Complaints in the Underlying Lawsuits expressly allege "bodily injury" and "property damage" caused by an "occurrence", as those terms are defined by the Policy.  Such allegations squarely trigger the Insuring Agreement in Coverage A of the Policy.

69.     Reade has complied with all obligations set forth in the Policy and is entitled to full coverage.

70.     Reade is entitled to a judicial determination that Liberty is obligated to provide coverage to Reade under the Policy including, but not limited to, a determination that, upon exhaustion of the "Self-insured amount", Liberty is obligated under the Policy to reimburse Reade for its "allocated loss adjustment expense" incurred in connection with the Underlying Lawsuits.

19

71.     Reade is also entitled to a judicial determination that, upon exhaustion of the

"Self-insured amount", Liberty is obligated under the Policy to indemnify Reade for any liability

adjudged against it in the Underlying Lawsuits, up to the Policy limits.

**WHEREFORE**, Reade demands judgment against Liberty:

    (e)    Declaring that:

        i.    Liberty is obligated to provide coverage to Reade under the Policy;

        ii.    Upon exhaustion of the "Self-insured amount", Liberty is obligated under the Policy to reimburse Reade for its "allocated loss adjustment expense" incurred in connection with the Underlying Lawsuits, up to the Policy limits; and

        iii.    upon exhaustion of the "Self-insured amount", Liberty is obligated under the Policy to indemnify Reade for any liability adjudged against it in the Underlying Lawsuits, up to the Policy limits;

    (f)    For reimbursement by Liberty of Reade's attorneys' fees, expenses and costs incurred in prosecuting this coverage action; and

    (g)    For such other and further relief as the Court may deem just and proper.

## SECOND COUNT

### (Breach of Contract)

72.     Reade repeats and incorporates the allegations contained in the foregoing

paragraphs as if fully set forth herein.

73.     Liberty agreed to provide coverage to Reade as set forth in the Policy.

74.     By virtue of its actions and failures, including but not limited to those set forth

herein, Liberty has breached the terms and provisions of the Policy and its duties thereunder.

75.     Liberty continues to be in breach of the Policy by refusing coverage and

otherwise failing to comply with the Policy.

76.     Reade has performed all obligations required of it under the Policy, except those otherwise excused.

77.     No exclusions bar coverage for Reade's claim.

78.     As a direct and proximate result of Liberty's breaches of the Policy, Reade has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limits.

**WHEREFORE,** Reade demands judgment against Liberty for:

      (a)     compensatory and consequential damages;

      (b)     pre-judgment and post-judgment interest;

      (c)     attorneys' fees, expenses and costs; and

      (d)     such other and further relief as the Court may deem just and proper.

### THIRD COUNT

### (Breach of Implied Covenant of Good Faith and Fair Dealing/Bad Faith)

79.     Reade repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

80.     By its aforesaid actions and omissions, *inter alia*, Liberty has failed (and continues to fail) to deal fairly and in good faith with Reade by refusing, prematurely and without proper cause, to provide coverage under the Policy.

81.     Liberty has denied coverage under the Policy without a fairly debatable basis.

82.     Liberty knew or recklessly disregarded the lack of a fairly debatable basis for denying coverage.

83.     Liberty's actions constitute bad faith.

**WHEREFORE,** Reade demands judgment against Liberty for:

(e)     compensatory and consequential damages;

(f)     punitive damages;

(g)     pre-judgment and post-judgment interest;

(h)     attorneys' fees, expenses and costs; and

(i)     such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Date:  March 3, 2022                    By:     _____
                                                STEPHEN M. PACKMAN
                                                Archer & Greiner, P.C.
                                                Three Logan Square
                                                1717 Arch Street, Suite 3500
                                                Philadelphia, PA 19103-2739
                                                (215) 246-3147
                                                spackman@archerlaw.com

                                                        and

                                                TREVOR J. COONEY
                                                Archer & Greiner, P.C.
                                                1025 Laurel Oak Road
                                                Voorhees, NJ 08043
                                                (856) 616-2681
                                                tcooney@archerlaw.com

                                                Attorneys for Defendant

223328757v1

22